

FILED - USDC -NH
2024 AUG 12 PM3:24

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Kay Sieverding,
Plaintiff

V.

United States Department of Justice,
Defendant

Initial complaint

## Summary

1) This complaint is based on 5 USC § 552a (e)(5), 5 USC § 552a (e)(7), and 5 USC § 552a

(e)(4).  The series of events involved the DOJ arresting plaintiff 3 times, detaining the plaintiff

for 5 months, without a criminal charge, and making threats of new arrest, all  in order to enforce

so called "filing restrictions" against related pro se litigation.  The first claim is based on the

USMS's inaccurate entries that the plaintiff was prosecuted under criminal "obstruction of court

order" and a felony charge. The second claim is based on the USMS's possession of the

plaintiff's third party lawsuit records – without an authorized law enforcement function. The

third claim is based on the USMS's use of the Prisoner Tracking System to detain her without a

criminal charge, even though DOJ's System of Records Notice said that the individuals whose

records should be included were only alleged criminal offenders.

2) Even though the DOJ arrested and imprisoned the plaintiff in 2005 to 2007, this action is

timely under 5 USC 552a § (g)(5), a savings clause applicable when there have been previous

material misrepresentations.

3) The language of the Federal Tort Claims Act allows a res judicata defense, but the Privacy Act

does not do so.  In fact, in 2023, several federal agencies published notices of proposed

amendments to the Code of Federal Regulations that would allow a res judicata defense. Those

proposed amendments to the CFR were not approved. The CFR allows a res judicata defense

under 5 USC § 552a only when the complainant is a corporation.

4) In previous litigation, the DOJ made statements in conflict with legal documents it

promulgated, which is prohibited by the doctrine of judicial estoppel.

### Series of Events – 42 USC § 1983 and defamation litigation

5) The plaintiff filed a lawsuit under 42 USC § 1983 in the District of Colorado, 02-cv-1950.

6) Her CO 02-1950 case was dismissed, her appeal denied, and she was told to pay $110,000.

7) The $110,000 attorney fee shifting request was only legally valid if the plaintiff could not

prove any 42 USC § 1983 claim. The plaintiff did have claims under 42 USC § 1983, but those

were not recognized by the district court and the court of appeals.

8) The $110,000 was a form of witness retaliation, made by the same parties who caused the

DOJ to unlawfully arrest and detain the plaintiff. If the plaintiff had filed for bankruptcy to

avoid the $110,000 attorney fee shifting order, her 42 USC § 1983 claims would have been lost

in bankruptcy. However, she did not file for bankruptcy.

9) The city attorney's bills said that the allegations were "serious." Part of them related to city

misrepresentations claiming that a building was less than 1/5th of its actual size. The building

department gave an occupancy permit to a building that didn't match the building permit.

10) This conspiracy was intended to, and did, financially benefit Kevin and Jane Bennett.

Kevin Bennett was both her neighbor and the president of the city council. He was a drug dealer,

and a convicted felon, but did not acknowledge his criminal record until 2009.

11) The plaintiff was aware in 2000 that Bennett was a convicted felon and supplier of pot and

cocaine. Her 02-cv-1950 complaint incorporated these facts. Bennett had a fantastically

beautiful property at 701 Princeton Ave, Steamboat Springs CO. He supplied drugs for use there. This gave him leverage to convince officials and baby boomer attorneys to do illegal acts.

12) Bennett's attorney in 02-1950 was David Brougham. The Rules of Professional Conduct, candor towards the tribunal, required Brougham to acknowledge Bennett's criminal background, because the magistrate implied that Bennett did not have a criminal background, and Brougham knew at the time that Bennett was a convicted felon. Brougham itemized a discussion of Bennett's NCIC record in his verified attorney bills.

13) The newspaper, the Steamboat Pilot & Today, participated in the conspiracy by intentionally misrepresenting facts in a series of in paper only publications in 2000-2001. Specifically, it repeatedly published that local officials had told the plaintiff that her complaint regarding a zoning conspiracy about a "garage addition" was unfounded. However, the so-called "garage addition" was really a house – that is over 1,400 square feet and is currently finished with 2 bathrooms, a laundry room, a kitchen, dining room, bedroom, living room etc. The City of Steamboat claimed that the building is a garage with an additional 217 square feet divided into three rooms. It does not acknowledge that there was a full second floor nor that the three rooms were much larger than stated in the building permit. Her complaint said that the newspaper staff was aware at the time that the building was much larger than officials claimed.

14) The Steamboat Pilot, to this day, publishes that there was probable cause to prosecute the plaintiff for misdemeanor harassment of Jane Bennett. That is impossible because Jane Bennett stated under oath that she had no reason to believe that the plaintiff had been following her around town, that there was no offensive touching, and that the two women had very little interaction. Also, Jane Bennett's police report stated that all the plaintiff did was accuse her of violating the zoning. Jane's report said that the plaintiff was on the paved street and Jane was on

her own property.  Jane also said that the plaintiff had called Kevin Bennett an "asshole."
"Asshole" does not meet the legal definition of obscenity for the harassment statute.

15) Midway through her 02-cv-1950 lawsuit, the Steamboat Pilot first published its articles about the plaintiff on the Internet.  At that time, it was over 2 years since the last paper publication. When it republished the prior paper only articles, the publisher had been receiving reports of the litigation, because she was a defendant, and so there was no question that she knew that the plaintiff disputed the factual misrepresentations in the articles – that there was probable cause to prosecute her for harassment and that all that Bennett built was a garage addition.

16) To this day, there is no case law that the plaintiff could find, despite diligent research, ruling that online publications are linked to two year old paper-only publications under the old "one publication rule."  A New York State opinion said that the matter had never been decided.

17) In October of 2004, the plaintiff attempted to stop the online publications by filing in the District of Minnesota. A magistrate was assigned for an R&R.  He held a hearing and the Sieverdings attended it in Minneapolis, where they argued that the one publication rule did not apply. The magistrate probably agreed but there was no Minnesota R&R.

18)  Without any discussion of the statute of limitations, the District of Minnesota lawsuit was dismissed on the only basis that Judge Nottingham in Colorado had ordered that the plaintiff could not represent herself.  Her appeal was also dismissed, on the same basis that she could not represent herself.

19) Federal judges are not tested for illegal drug use or alcohol levels.  Nottingham was a regular purchaser of prostitution services in 2004 and later and he made a public statement saying that he was so drunk in a strip club that he lost his memory.

4

20) The plaintiff had employed a public relations consultant in the mid 80s when she and her husband had started a company with an unique product, Friendly Plastic (™). That consultant had called the plaintiff and said that she had seen the Pilot's publications. The consultant predicted that neither the plaintiff nor her first husband would ever get a good job or business investment as long as the publications were online.

21) The plaintiff tried suing again, filing against the Pilot's owner /manager in the District of Kansas. The owner, located in Kansas, had a server broadcasting the defamatory articles on the Internet, and acted to manage the Pilot, according to newspaper articles.

22) The plaintiff filed a MTD the Kansas complaint for the only reason that federal district court Judge Edward Nottingham threatened her with long term detention if she did not.

23) The online Steamboat Pilot publications have caused the plaintiff anxiety for almost 20 years. She has approached the publication many times asking them to remove or correct their online articles and they simply refuse.

24) Routt County Court emailed the publisher that the misdemeanor charges were dismissed, but their online publications still don't say the charge was dismissed.

25) Before she filed her Colorado 02-cv-1950 complaint, the 10th Circuit ruled in *Garley v. Sandia Corporation*, 236 F.3d 1200 (10th Cir. 2001) that a civil conspiracy complaint can continue even if a defamation claim is dismissed. However, the Pilot's defense attorney claimed that newspapers cannot be sued for conspiracy. He violated his Duty of Candor.

26) Eighteen months before she filed 02-cv-1950, the Steamboat Pilot published an interview with a prosecutor who had dismissed the criminal harassment charge against the plaintiff. She told reporters that the plaintiff was guilty but a trial would be too expensive. The R&R misrepresented that "absolute prosecutorial immunity" prohibited the claim for the press

5

conference – which conflicted with established law that prosecutorial immunity applies only to prosecutorial functions, not press conference, and therefore they can be sued for defamation. Because the prosecutor identified herself as acting under color of law when she gave the press conference, that claim was valid under 42 USC § 1983 and had a 2 year statute of limitations. The defendants did not take an 11th Amendment defense.

27) The criminal prosecution of the plaintiff was initiated by plaintiff's neighbor Jane Bennett, Kevin's wife, who signed the police misdemeanor summons and complaint on the line for the police officer. Jane was acting under color of law when she signed as a police officer and because she acted in conspiracy with Kevin Bennett.

28) The Colorado 02-cv-1950 complaint had a 90 day equitable tolling under State of Colorado ordinance, because she had previously filed a defective complaint. That brought the initiation of the misdemeanor harassment claim within the 2 year 42 USC § 1983 statute of limitations.

29) There were a whole series of overt illegal acts under color of law. These overt acts involved the same people and the same location – Kevin Bennett and Princeton Ave. Because they involved the same purpose, to benefit Bennett's real estate, the same location, and the same actors, the overt acts in previous years were within the statute of limitations.

30) The 02-cv-1950 lawsuit resulted in an inaccurate magistrate's report and recommendation.

31) In 2009, the plaintiff sued the DOJ in District of Columbia 09-0562. The DOJ filed:

In 2002, Plaintiffs filed a 106-page complaint related to a zoning dispute with their former neighbors in the United States District Court for the District of Colorado.

32) The DOJ tried to plant the assumption that the plaintiff had claimed constitutional injury from discretionary legislative action, but that was not the case. The DOJ has repeatedly tried to claim that she did not have a valid claim under 42 USC § 1983.

33) In 2013, the DOJ wrote a letter to the plaintiff's congressman and claimed that she did not have a claim under 42 USC § 1983 in her Colorado litigation.

34) The plaintiff sent the DOJ a request to amend the letter to Senator Edward Markey to acknowledge that she did have 42 USC § 1983 claims.

35) The DOJ claimed that it did not have authority to amend statements about lawsuits. In order to avoid correction of its letter, the DOJ misrepresented that the law prohibited correction of statements about lawsuits.

36) In 2023, several government agencies published notices of proposed rulemaking that would have exempted statements about lawsuits from amendment. However, the proposed amendments to the Code of Federal Regulations were not approved. This shows that her administrative amendment request concerning the letter to Senator Markey was wrongfully denied.

37) As discussed in Colorado 02-cv-1950, defendant Jane Bennett filed a verified summons and complaint for a restraining order but did not allege any physical contact or threat of physical contact, which were the requirements for a keep away order in Colorado.

38) Jane Bennett's verified statement misrepresented that the plaintiff had trespassed on her land and threatened her employees. This directly contradicted both her and their testimony in court and was therefore perjury.

39) Jane Bennett hired attorney Randall Klauzer to represent her at a hearing on 09/06/2000 concerning her petition for a restraining order. Klauzer did not claim jurisdiction under Jane Bennett's complaint but instead said there was jurisdiction under criminal statutes. Klauzer was acting "under color of law" because he claimed in court to be enforcing criminal statutes.

40) The county judge James Garrecht misrepresented that there is a court process in which a district attorney applies for a temporary keep away order on behalf of the alleged victim if a

criminal charge has been lodged.  In fact, the order automatically issues without an oral hearing, see Colo. Rev. Stat. § 18-1-1001 (1).

41) The district attorney did not file a criminal complaint and did not show up for an arraignment, nor for a plea hearing.

42) An important difference between a keep away order issued under criminal prosecution and one issued in response to a complaint from an alleged victim is that the first automatically ends with the criminal proceedings but the latter, in Colorado, lasts for life.  The plaintiff did not appeal the restraining order, because the judge said it would end with the criminal proceedings. However, he used the forms for civil proceedings, which was very confusing.

43)  Even though the plaintiff did not have a relationship with Jane Bennett, the continuation of the keep away order after the criminal complaint was dismissed was a major problem for the plaintiff.  The Bennetts repeatedly requested her arrest and repeatedly lied to the police.

44)   Jane Bennett. told the police that the plaintiff had driven the wrong way around the parking lot in order to threaten her but that was physically impossible.

45) Kevin Bennett told the police that his property went all the way to the paved street, when in fact it ended over 10 feet from the street.  He tried to get the plaintiff arrested for having one foot off the pavement while she was alone, taking photographs of her own property.

46) Jane Bennett told the police that the plaintiff was screaming while she was saying a 4 syllable word, which is impossible.  Try it.  You cannot scream "constitution" as Jane alleged.

47) Jane Benentt told the police that Sieverding was "jumping up and down" while screaming, which was inconsistent with her being then 46 years old and overweight.

48) The Bennetts also claimed that Sieverding had violated the restraining order by faxing a legal document to Kevin Bennett's published city council fax number. The police came to her home and threatened to arrest her because she faxed the city council.

49) Judge Garrecht's Supreme Court based "immunity" for his misrepresentations at the restraining order hearing did not extend to his co-conspirators, Randall Klauzer, Jane Bennett, Kevin Bennett, other city officials, or to the Steamboat Pilot publisher.

50) Randall Klauzer violated the Duty of Candor by misrepresenting in court that the plaintiff had "molested" Jane Bennett.  That conflicted with Jane's TRO transcript. "Molestation" requires physical contact.  Jane had testified there was no physical contact.

52)  The Steamboat Pilot published, and continues to publish,  Klauzer's baseless allegations that the plaintiff had "molested" Jane Bennett. Despite the fact that the rest of the building was clearly larger than 217 s.f., see building photograph, the newspaper to this day publishes that it was only a garage addition.   The newspaper was acting "under color of law" because it was in conspiracy with Kevin Bennett and the planning department when it misrepresented the size of the building and with Bennett, the police, and Klauzer when it published that the plaintiff "molested" her neighbor.

53) At the restraining order hearing, Judge Garrecht misrepresented that he had discretion to issue a keep away order even if there was no physical assault or threat of assault.

54) Judge Garrecht issued a permanent keep away order based on Klauzer's false claims that the plaintiff molested Jane.

55) Without applying any tolling, any conspiratorial overt act that happened after October of 2000 was within the statute of limitations for 42 USC § 1983.  The complaint included:

¶ ¶ 352-354 To make the L-shaped lot seem viable to  potential buyers, in the fall of 2000, the Sieverdings removed expensive landscaping, recently installed, and formed a rough drive into

their lot near Benentt's drive and put up a sign saying "private drive." The Bennetts responded by regularly parking in front of the drive. Police officer Shane Jacobs told Kay Sieverding that Chief of Police Art Fiebing told the police not to enforce the CO traffic law that prohibited parking within 5 feet of a drive [on their street only.] ¶ 296 At the request of Jane and/or Kevin Bennett, police came to Sieverding's home without a warrant early on Sunday 12/13/00. When [first husband] let them come inside, they refused to leave for half an hour, although the Sieverdings were in their pajamas and Kay Sieverding called police dispatch to complain. ¶ 295 After a bogus criminal complaint filed by Kevin Bennett, the police went to the high school on [3/31/01] to interview [older son] about whether his mother was at Bennetts' thereby causing [him] embarrassment and emotional distress. ¶ 301 Randall Klauzer and Jane Bennett wrote deceitful responses to the Court dated 7/25/01 and 9/21/01 implying the restraining order was properly issued and that Kay Sieverding had done something illegal. ¶¶ 316-317 The Steamboat Pilot and Today newspapers repeatedly printed statements such as "The City's planning department had responded to Sieverding's claim and notified her that the Bennetts' construction is in compliance with the City's Code." Kay Sieverding had repeatedly given them detailed and incontrovertible evidence that it was a lie. ¶¶ 334-335 On 11/26/01, Paul Hughes [city manager] wrote that he refused to have research done saying Bennett's construction "complied with all regulations in effect at the time of permitting" and he sent a copy of his letter to almost all the CITY policy makers. Hughes sent his 11/26/01 letter to the council and [city attorney] making the refusal to investigate policy not negligence. ¶ 324 On 2/01/2002, Charles Lance [a prosecutor] sent Kay Sieverding a deceitful fax with false statements of law claiming that if she called Kevin Bennett an "asshole", as alleged, that would constitute harassment of Jane Bennett. ¶¶ 326- 333   From July 2000 to March 2002, the Sieverdings repeatedly contacted the CITY policy makers and requested, offering to pay, that someone working for the CITY compare Bennett's construction... and the City ordinances. [City ordinances authorized the planning department to do extra research for pay.]  In September 2002, Steamboat planner Tim McHarg indicated to Kay Sieverding that he might do the research she needed. Sieverding sent McHarg a check for his time and called him to follow-up, but Time McHarg told Kay Sieverding that he checked with City attorney Anthony Lettunich and City manager Paul Hughes who told him not to compare Bennett's buildings to the laws.

56) The overt acts within 2 years of the 02-cv1950 filing alleged in the previous paragraph of this complaint were sufficient to overcome the statute of limitations defense.

57)  The Colorado Magistrate's R&R  misquoted the 8th Circuit about whether or not a dismissal under Rule 41 with no responsive pleadings caused res judicata.   A district court had ruled that there was "res judicata" even when no responsive pleadings were filed. The 8th Circuit overruled the lower court. The R&R used the lower court ruling and attributed it to the 8th  circuit court instead of acknowledging that the lower court ruling was reversed. The 8th Circuit ruling was *In*

re Piper v. Aircraft Dict. Svs. Antitrust Litigation. 551 F.2d 213, 219 (8th Cir. 1977). The R&R includes this citation but pairs it with the lower court ruling that was overturned.

58) In Colorado, an oral hearing is required in order for a law enforcement agency to file a motion to dismiss a criminal charge.

59) Plaintiff's 02-1950 complaints specifically pleaded that there was a departure from legally required criminal court procedure in the misdemeanor harassment proceedings by allowing a written MTD the harassment charge without an oral hearing.

60) The Colorado district court misdemeanor proceedings were not accidentally ended without an oral hearing, as shown by the fact that after the MTD was granted, her lawyer filed a motion for an oral hearing, the district attorney opposed the motion, and the court denied it. This shows that both the county judge and the district attorney were part of the conspiracy.

61) The Colorado Magistrate's R&R misrepresented that she had not claimed any intentionally tortious acts by any attorneys when Klauzer's statements that the plaintiff had molested Jane Bennett were clearly tortious.

62) Other tortious acts by attorneys included Richard Tremaine's falsely misrepresenting to the city council that Bennett had only built a garage, James Oliphant's letter misrepresenting that Bennett was the owner of the barricaded street and threatening the plaintiff's business, staff attorney Daniel Foote letter saying that she had to get permission to garden from the city manager (even though no one else had to), Colette Erickson's threats that the plaintiff would be incarcerated for 180 days for not having a trimming permit (even though the city didn't issue trimming permits), Bridget O'Rourke misrepresenting that a deferred prosecution agreement depended on a side agreement with Kevin Bennett involving city conversion of land adjoining hers and giving Bennett land for free, Elizabeth Wittemyer avoiding the rules of criminal

procedure to withdraw the harassment charge without a court hearing and then telling the press
that there was probable cause but a trial would be too expensive, Ron Stock, then city attorney,
sending a letter to the plaintiff misrepresenting that it was legal for the city to have different
requirements for properties in the same zoning district, and Anthony Lettunich prohibiting Tim
McHarg from researching the size of Bennett's building and comparing it to the ordinances.
Only a few years ago Daniel Foote, in capacity as city attorney, sent the plaintiff a letter that
misrepresented that the City does not regulate accessory buildings.

63) The plaintiff was denied her due process right to confrontation in the Colorado district court.
She filed objections, but there were no hearings. She filed motions for partial summary
judgment, but the magistrate ordered the defendants to ignore them. The R&R relies on
misrepresentations for which she was not allowed a mechanism to object to. In fact, the R&R
discussed two letters the magistrate received from the defense council. Sieverding did not receive
copies of either so she requested them but the magistrate denied her motion.

64) Plaintiff's 02-cv-1950 Colorado complaint had included a quotation from Jane Bennett to
the district attorney implying that she and the plaintiff had had ongoing verbal confrontations
over a period of years. The next paragraph in her complaint had said that there was no truth to
the accusations. Jane said under oath that before their conversation on 08/26/00 she had not
talked with Sieverding in years. Jane agreed that the last time they spoke Sieverding had asked
Jane if she smelled smoke. A nearby building burned that day.

65) The 10th Circuit 04-1108 appellant reply reiterated the accusations from Jane Bennett as if
they were true, left out plaintiff's explanations as to what actually happened, and conflicted with
what Jane had said under oath when cross examined by Sieverding.

66) Because there was no joint appendix, only a defense appendix, her objection to the Magistrate's R&R was not distributed to the 10th Circuit panel. PACER did not include the document because ECF had not been installed at the time.  The 10th did not acknowledge that an objection had been filed and therefore used the plain error standard to review the R&R.

67) There was no explanation in the R&R as to why the facts described in the R&R differed so substantially from the complaint even though the defendants did not  file for summary judgment and there was no discovery.

68) The first page of the R&R referred to two criminal actions taken against the plaintiff in Steamboat Springs. It violated 28 CFR § 20.3 by not including the disposition for either one and it misrepresented the identity of the prosecuting agency, the criminal charge of the first prosecution, and the location of the court.

69) Both charges were prosecuted by the police at the instigation of Jane Bennett and Kevin Bennett. No state or county prosecutor was at all involved in the initiation of either complaint. However, the R&R specifically misrepresented that a prosecutor had initiated charges. Colorado allows misdemeanor prosecutions based on a ½ page police summons and complaint short form.

70) The R&R misrepresented that a state prosecutor charged her with cutting down trees.

71) She was actually charged by the police in municipal court for "trimming permit required."

72)  The City did not and still does not  have trimming or gardening permits. They have a law on the books requiring permits to mow your lawn but they don't enforce the law. They have never issued a trimming permit.

73) As stated in her verified complaint, she was required to sign a side agreement with Kevin Bennett as a condition of deferred prosecution of the charge and explicitly threatened with a jail sentence if she did not. See fax of deferred prosecution and side agreement.

74) The federal Magistrates Act prohibits magistrate judges from ordering attorney fee shifting. but the Colorado magistrate did so anyway.  The defense counsel initiated a collection action against her family and property in Dane County Wisconsin, where she had moved.

75) The Magistrates Act does not allow magistrate judges to prohibit parties from responding to summary judgment motions,  but the Colorado magistrate did so anyway.  That conflicted with the Code of Conduct for Federal Judges.

76) The Colorado magistrate had substantial repeated otherwise ex parte conferences with David Brougham, who represented Kevin Bennett and the City of Steamboat Springs. These are itemized in Brougham's bills.  City attorney Anthony Lettunich's  bills also show a three way long distance call with the magistrate's clerk and David Brougham concerning future events. Both itemize  circulation of a draft motion for filing restrictions but such motion was never filed.

77) Although she filed a timely objection to the R&R, there was no hearing on it and the assigned judge, Edward Nottingham, did not repeat any of her objections.

78) The American Bar Association had been a defendant in Colorado 02-cv-1950.  The plaintiff alleged that the ABA was a proximate cause to the conspiracy against rights because it had taken actions to substitute ineffective regulation for effective self regulation.

79) In Canada but not in the United States, bar associations are required to regulate members. Attorneys and law firms are prohibited from claiming "immunity" for themselves.  The Supreme Court of Canada upheld a pro se complaint against a bar association, awarded cash damages, and said the pro se litigant was a hero.

**Witness Intimidation**

80) The lawyers representing the ABA made overt threats that she and her husband would be arrested if they pursued the related litigation.

81) On 09/02/2005, Judge Nottingham issued a minute order saying that the plaintiff should be detained until she filed motions to dismiss the related cases.

82) The USMS Policy Directives say that if there is no warrant, a criminal complaint must be filed by the USMS officer. There was no warrant nor was there a criminal complaint.

83) The United States Marshals took the plaintiff into custody and held her for 124 consecutive days – without any bail hearing, compliance hearing, or other hearing.

84) In order to detain the plaintiff, the USMS entered the nonexistent charge of "obstruction of court order" into the Prisoner Tracking System. The computer system requires an entry into the field for lead charge.

85) In order to make the entries into the Prisoner Tracking System seem valid, the USMS claimed that she had been arrested by the High Intensity Drug Task Force. She was not interviewed and the DOJ did not test her for evidence of heroin, opioids, etc.

86) On 01/04/2006, Judge Nottingham ordered the USMS to release the plaintiff, solely because she had agreed to his extortionist demand that she dismiss the related lawsuits.

87) On 02/04/2006, Judge Nottingham ordered the USMS to arrest the plaintiff again.

88) In order to arrest the plaintiff again, the USMS in Colorado sent the USMS in Wisconsin, where she lived, a misleading summary of her 02-cv-1950 complaint, which was included in a USMS report on arresting her.

89) In order to effect the rearrest in February of 2006, the USMS in Colorado entered nonexistent charges for obstruction of court order into the Warrant Information Network and the National Crime Information Center database.

90) The Chief Deputy USMS marshal in Colorado gave a prohibited statement to the Denver Post in February 2006 in violation of 28 CFR § 50.2.

91) In order to effect the rearrest in February of 2006, the USMS in Wisconsin also entered

nonexistent charges for obstruction of court order into the Prisoner Tracking System.

92)  In August of 2006, she filed  a notice of appeal of the Kansas case and a motion for

reconsideration in the DC cases.

93) The Colorado 02-cv-1950 defendants filed a so-called "motion" that the plaintiff should be

rearrested because she had taken steps to keep the related cases open.  Rule 7 requires that

motions cite the rule they are based on, but that document did not so so.

94) In September of 2006, Judge Nottingham ordered that the USMS should rearrest the plaintiff

because she had filed in the related cases.

95) In order to rearrest her, the USMS entered a charge for failure to appear in the WIN.

96)  The USMS Policy Directives are explicit that only an authorized assistant U.S. Attorney can

make a decision to prosecute for failure to appear and that the deputy must have authorization

from a prosecutor to enter a failure to appear charge into WIN.

97) No prosecutor authorized the USMS to enter a failure to appear charge into WIN.

98) In order to avoid arrest while still pursuing the related cases, the plaintiff went to Canada.

99) The USMS  called the plaintiff in Canada and threatened her with rearrest.

100) In November of 2006, the 10th Circuit ruled that Judge Nottingham did not have

jurisdiction over her related cases in the District of Columbia.

101) After the 10th Circuit ruled, the plaintiff returned to her family home in Wisconsin and filed

new documents in the related cases.

103) One of the  related cases was District of Columbia 05-02122. It claimed that the ABA and

two law firms participated in a conspiracy under 42 USC § 1985(2) to to deter her from filing in

the DC cases by force, intimidation, or threat.   Her 05-02122 complaint specifically said that

two lawyers representing the ABA threatened the plaintiff with arrest if she pursued her claims in the District of Columbia 05-01283 and 0v-01672 cases.

104) The law firms defending 05-02122 specifically misrepresented in their court filings that 42 USC § 1985(2) requires race based animus.

105) Before the law firms misrepresented that 42 USC § 1985(2) requires race based animus, the United States Supreme Court had ruled twice that race or class based animus is irrelevant to claims under 42 USC § 1985(2).

106) If the two DC law firms had been acting in good faith they would not have made statements that conflicted with the U.S. Supreme Court decisions. That violated their duty of candor. When they misrepresented the law, they were fully aware that the plaintiff was in a county jail and would be unlikely to have access to Supreme Court rulings.

107) The D.C. court claimed that it was "sua sponte" finding res judicata.

108) The DDC ruling in 05-02122 was very specific in claiming that res judicata was caused by a one page motion (identified by docket number) she filed while she was in jail, which Judge Nottingham denied with a one sentence ruling addressing two motions. The defendants did not file an objection to her 2005 motion. Judge Nottingham denied her motion within a few days as was his standard procedure in her case.

109) Judge Nottingham's one sentence ruling was not a valid judgment as defined by the Restatement of Judgments and therefore could not be the basis of a res judicata finding.

110) The plaintiff filed a timely tolling motion of reconsideration of the ruling finding res judicata in 05-02122. However, the D.C. court denied it.

111) The DC. Court denial of her motion for reconsideration added an order against pro se litigation in the District of Columbia.  It did not set them out in separate documents as required and the clerk did not enter the orders as judgments.

112) The plaintiff filed a motion for reconsideration of the DDC "filing restriction."

113)  The law firms filed objections to her motion for reconsideration of the filing restriction.

114) The D.C. Court denied her motion for reconsideration of the filing restriction.

115) The Clerk of Court did not enter the judgment of dismissal nor the later order of a filing restriction and did not identify a due date for a notice of appeal.

116) The plaintiff  filed a timely notice of appeal within 150 days of the first and only D.C. filing restriction order.

117) The Court of Appeals generated a motion to show cause that her appeal was timely.

118) The same week, the local police found the nonexistent criminal charges for obstruction of court order and bail violation in the NCIC database.

119) The local police arrested her on the so-called federal charge of "obstruction of court order" on May 10 2007, but she told them that the charge was not valid.

120) The police called the Dane County Wisconsin sheriff to verify that there was a valid charge.

121)  The USMS in Colorado created a felony detainer and sent it to the Wisconsin sheriff .

122) An assistant U.S. Attorney showed up in court and said that no one in his office had any knowledge of the plaintiff or charges against her and that the government was not involved.

123) Based on the USMS detainer for the non existent felony the USMS held the plaintiff for another three weeks without any criminal charge. This was extremely stressful because on three separate occasions in May of 2007 the DOJ shackled the plaintiff, seated her with maximum

security male prisoners, and told the maximum security prisoners her name.  It also caused a lot of problems for her family which needed her attention to their family business.

124) In order to detain the plaintiff in May and June of 2007, the USMS again entered the non existent charge of "obstruction of court order" into its Prisoner Tracking System.

125) In order to bring the plaintiff from Wisconsin to Colorado in May of 2007, the USMS entered a non-existent removal warrant into the Justice Prisoner Air Transport System and classified her as maximum security. .

126) In June of 2006, Judge Nottingham explicitly threatened the plaintiff with rearrest if she should pursue the related litigation again. She believed that she would be rearrested that summer if she pursued her 05-02122 appeal.

127) Because of the 2007 arrest, the plaintiff was unable to properly respond to the D.D.C. Court of Appeals motion that her notice of appeal was filed too late.

128) Because of the long 2005-2006 detention, the 2006 arrest, the 2007 arrest, the USMS threats of arrest between the 2nd and 3rd arrests, the plaintiff was traumatized, distracted by trying to get and stay out of jail, had cash flow problems, had a backlog of chores, and lacked proper access to legal materials, burdening her prosecution of 05-02122.

129) The 124 continuous days 2005 to 2006 detention impermissibly burdened her litigation of the all three DC cases.  Except for the motions for reconsideration, she was in detention during all the motion practice in those three cases.  She could not rewrite on her computer.  Everything she filed was typed by a service that her first husband hired and she was not able to proof read them or make revisions before they were filed.

130)  The plaintiff diverted her time and attention to habeas corpus motions instead of focusing on her 05-02122 complaint.

131) "Obstruction of court order", 18 U.S.C. § 1509, requires violence or threat of violence.

132) The plaintiff did not threaten anyone with violence.

133) The USMS knew the identity of the deputy/deputies who created the false entries that she had been charged with "obstruction of court order" and the counterfeit felony detainer. His email addresses with his unique badge number(s) appeared in the record. The PTS and WIN had unique user ids. According to FOIA releases, the USMS deputies were never interviewed by internal affairs. The DOJ never created an internal affairs investigation report.

134) The plaintiff filed 09-09562 in the District of Columbia and claimed that the DOJ had violated various sections of 5 USC § 552a.

135) To get her 09-0562 complaint dismissed, the DOJ made material misrepresentations.

136) The DOJ's material misrepresentations in 09-0562 conflicted with the DOJ's systems of records notices published in the Federal Register, Chapter 28 of the Code of Federal Regulations and positions that the DOJ had taken in other litigation.

137) When the plaintiff attempted to sue the DOJ again, the DOJ misrepresented that her new claims were barred by the doctrine of res judicata.

138) In December of 2023, the plaintiff discovered the doctrine of judicial estoppel and realized that it barred the defenses that the DOJ had asserted in DDC 09-0562. Her prior pleadings did not use the term "judicial estoppel."

139) The 5 USC § 552a (g)(5) tolling clause is triggered by knowledge of the details of material misrepresentations. It does not penalize plaintiffs who don't know the doctrine of judicial estoppel or who are not represented.

140) All the DOJ staff plaintiff interacted with have resisted acknowledging the illegality of the arrests and detentions.

141) She approached the DOJ counsel assigned to the DDC case of 09-0562 regarding making a joint motion to establish certain facts, but they absolutely refused even though the judge's order contains factual misrepresentations caused by DOJ's misrepresentations to the court.

142) There are a number of court opinions, by different judges, saying that the criminal records systems are exempt from the Privacy Act. All those cases were brought by federal prisoners so by definition all of their records were created during the process of enforcement of the criminal records. Thus, the records of convicted federal prisoners are exempt under 5 USC § 552a (j)(2)(C.). That does not mean that all records in all criminal systems of records are "exempt," only that 99.9999999999% of the records in the criminal systems of records do belong to alleged criminal offenders. The judges just used shorthand leaving out the exceptions, because they didn't expect a case in which the exceptions were applicable.

143) The pro se plaintiff was very confused by the court orders, because she did not realize at the time that the orders were based on motions that were barred by judicial estoppel

144) The DOJ misinformed Senator Tammy Baldwin that the plaintiff was arrested on a warrant for contempt of court. The DOJ misinformed Senator Edward Markey that she had very little contact with the DOJ. The DOJ misinformed Senator Jeanne Shaheen that the plaintiff was arrested on a warrant for civil contempt.

### Claim One

145) The Privacy Act requires that agencies keep records about individuals that are sufficiently accurate to make determinations.

146) The USMS made determinations to arrest and detain the plaintiff, and a determination to threaten her with arrest if she returned from Canada.

147) "FindLaw Legal Dictionary" defines "determination" as a "decision of a court or administrative agency regarding an issue, case, or claim" thus the USMS decisions to arrest and threaten the plaintiff with re-arrest meet the legal definition of "determination."

148) The local police made a decision to arrest the plaintiff based solely on the USMS fraudulent entries of criminal charges into the NCIC.

149) Because the plaintiff was not actually charged with the crime of "obstruction of court order", nor with bail violation, nor with a felony, the USMS did not maintain records that were accurate enough to support the decisions to arrest and detain the plaintiff.

150) The USMS Colorado criminal desk staff decided that the plaintiff deserved the sanctions of the criminal justice system, even though they were not lawyers and in 100% of other arrests relied on court orders solicited by authorized assistant United States Attorneys.

151)  By acting on their own to make and implement prosecutorial decisions, the USMS knowingly and intentionally increased the probability of error.

152) It is a legal maxim that the prosecutor is the person responsible for making sure that the defendant has procedural criminal justice protections such as a criminal complaint within 30 days of arrest, a bail hearing, the presumption of innocence, a right to an attorney, a right that she or her attorney can cross examine witnesses, etc.  Without a prosecutor to protect her, the plaintiff received none of these rights.

153) The USMS documents released to the plaintiff showed the unique badge number of the deputy who wrote to the sheriff and misrepresented that the plaintiff was charged with a felony.

154) The DOJ never interviewed the deputy who created and sent the felony detainer.

155) The PTS and WIN system have unique user ids and passwords and supposedly create audit trails.  The DOJ never interviewed the person(s) who entered the nonexistent obstruction of court order charges into the PTS and WIN.

156) Accepted standards for law enforcement require an internal investigation report for any allegation of illegal conduct.  The plaintiff specifically complained to the U.S. Attorney and the FBI that the arrests constituted witness intimidation and referred to 18 USC § 1512.

157) In 09-0562, the DOJ misrepresented that its records of the plaintiff's arrests and detentions were exempt from the accuracy and the compensation provisions of the Privacy Act.

158) The Code of Federal Regulations specifically states that the exemptions of the USMS systems of records apply only to alleged criminal offenders, investigations of violations of federal criminal statutes, and records created in the enforcement of federal criminal laws.

159) The Doctrine of Judicial Estoppel applies to the DOJ publications in the Code of Federal Regulations regarding the limits on exemptions of the USMS Prisoner Tracking System, the USMS  Warrant Information Network and the FBI's National Crime Information Center.

160) The Code of Federal Regulations (CFR) is a codification (arrangement of) the general and permanent rules published in the Federal Register by the executive departments and agencies of the Federal Government.

161) The Court of Appeals ruled in *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989)

It is well settled that an agency is legally bound to respect its own regulations, and commits procedural error if it fails to abide [by] them.

It cited *Service v. Dulles,* 354 U.S. 363, 379-380, 77 S.Ct. 1152, 1160-1161, 1 L.Ed.2d 1403, 1414 (1957); *Reuters Ltd. v. FCC*, 251 U.S.App.D.C. 93, 781 F.2d 946 (1986); *Panhandle Eastern Pipeline Co. v. FERC*, 198 U.S.App.D.C. 387, 402 n. 84, 613 F.2d 1120, 1135 n. 84 (1979), cert. denied, 449 U.S. 889, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980).

162) Because the plaintiff suffered financial damages as a result of the inaccurate entries into the PTS, WIN and NCIC, and the DOJ made representations that conflicted with the 28th Chapter of the CFR, which it promulgated, the plaintiff has a claim under 5 USC § 55a e(5).

## Claim 2

163) Without her permission, the USMS possessed records of plaintiff's 3rd party lawsuits.

164) The USMS report of arrest in February of 2006 included a half page description of her third party lawsuit.

165) Her 3rd party lawsuits were  part of the plaintiff's First Amendment Activities.

166) The plaintiff claimed violations of 5 USC § 552a e(7) in DDC 09-0562.

167)  The DOJ argued successfully in DDC 09-0562 that the USMS had the authorized law enforcement function of arresting the plaintiff based on valid warrants for her arrest and that therefore it was authorized to have records of her third party lawsuits.

168) The 09-cv-0562 defense that there were valid arrest warrants conflicted with the papers it filed in criminal cases.  In 100% of the other cases, the DOJ filed a criminal complaint before it requests a warrant for arrest, as is required by the Rules of Criminal Procedure.

169) In Russia and China, people, such as Wall Street Journal reporter Evan Gershkovich and Russian opposition leader Alexei Navalny, are arrested and detained for many months without a criminal complaint being filed first.  In totalitarian nations, the charges and basis of the charges are decided after the person has been arrested, intimidated, and sometimes tortured.

170) The United States Declaration of Independence cites this practice as a reason for rebellion.

171) The 4th Amendment includes "no warrants shall issue, but upon probable cause, supported by Oath or affirmation."

172) The attorneys who requested orders for her arrest did not support them with an oath.

173) The rules that are published in the Federal Register say that warrants for arrest must include the lead charge. The documents that the DOJ claims are arrest warrants don't include the lead charge. They don't say "obstruction of court order" or "contempt" – they say "failure to appear."

174) One of the so-called warrants used a fill-in-the-blank criminal warrant form published by the U.S. Courts administrative office.

175) The other document that the DOJ misrepresented was a valid arrest warrant used a civil caption but not the fill in the blank form from the U.S. Courts for short term arrest in a civil case, which specifies that the person to be arrested must have been subpoenaed.

176) The plaintiff was never subpoenaed. There was no discovery so there were no hearings  or documents to subpoena her for.

177)  The doctrine of judicial estoppel prohibits the DOJ from arguing that there were warrants for the plaintiff's arrest, because the DOJ never claimed in any other case that there were arrest warrants without a criminal charge being filed first.

178) The DOJ cannot produce what it claims is a valid warrant for the arrest of any other person without a criminal charge being filed first.

179) The plaintiff filed FOIA requests for every federal district requesting the last civil warrant available. The District of Colorado, where the plaintiff was arrested, responded "no records" and the EOUSA simply didn't respond for the other districts.

180) Because the DOJ made material misrepresentation that there were valid warrants for her arrest in 09-0562, while claiming that the documents it called arrest warrants justified the USMS's possession of her First Amendment lawsuit records,  the doctrine of judicial estoppel makes the plaintiff's claim under 5 USC § 552a e(7) valid at this time.

**Claim 3**

181) The DOJ published two System of Records Notices in the Federal Register for the Prisoner

Tracking System.

182) The DOJ system of records notices for the Prisoner Tracking System included:

CATEGORIES OF RECORDS IN THE SYSTEM:

Any and all information necessary to complete administrative processes, safekeeping, health
care, and disposition of individual Federal prisoners who are in custody pending criminal
proceedings, together with any law enforcement related records generated during such custody.

See *Federal Register*/Vol. 69, No. 82/Wednesday, April 28, 2004/Notices 2321

183)  The DOJ completed Intergovernmental Agreements with the three county jails that it

contracted to detain her.  Those agreements said:

The purpose of this Intergovernmental Service Agreement (IGA) is to establish a formal binding
relationship between the United States Marshals Service (USMS) and other federal user agencies
(the Federal Government) and ____ (the Local Government) for the detention of persons
charged with or convicted of violations of federal law or held as material witnesses (federal
prisoners)

184) In 09-0562, the plaintiff claimed that the DOJ had violated 5 USC § 552a (e)(4) by not

publishing a notice in the Federal Register that it would use the Prisoner Tracking System to

detain people who were not in custody pending criminal proceedings.

185) In 09-0562, the DOJ claimed that none of its actions violated 5 USC § 552a or  other law.

186) The doctrine of judicial estoppel prevents the DOJ from using a different definition of

federal prisoner than what was in the System of Records Notice for the Prisoner Tracking System

and in the Intergovernmental Agreements with the county jails to detain federal prisoners.

187) Since the plaintiff only recently became aware of the doctrine of judicial estoppel, and the

DOJ never corrected the material misrepresentations in 09-0562, the savings clause of 5 USC §

552a (g)(5) applies to her claims under 5 USC § 552a (e)(4).

**The DOJ resisted all attempts to correct the record**

188) The DOJ has avoided plaintiff's many attempts to get the agency to admit that its arrests and detentions of the plaintiff were illegal.

189) The United States Code, 18 USC § 401, prohibits federal judges from using contempt powers against people who are not lawyers or court clerks unless they violate a specific statute.

190) In 2023, the administrative office of the U.S. Courts republished an article on the subject of contempt. That article listed all the statutes that can be used to find someone in civil contempt. None of those statutes relate to "other" disobedience. None of the statutes authorized civil contempt detention were cited and none of them were applicable.

### Pecuniary Damages

191) The Supreme Court has ruled that a cause of action is a financial asset.

192) The DOJ's repeated arrests and threats of arrest caused the plaintiff to miss the deadline for appeal of 05-02122 and also to miss her chance to object to the Court of Appeals motion to establish timeliness of appeal notice by explaining that the two motions for reconsideration were directed at two different court orders – the dismissal and the new filing restriction.

193) The DOJ should have admitted that the arrests and detentions were illegal when they were first brought to the attention of the FBI – which happened in 2005. If the DOJ had admitted in 2005 or 2006 that her arrests and detentions were illegal, it would have made it much easier for her to get damages from the "deep pocketed" third parties who were behind the requests to Judge Nottingham to order the arrests of the plaintiff.

194) One of the lawyers who requested the arrests, David Brougham, represented the City of Steamboat's public official defendants, was billing an organization, the "Colorado Intergovernmental Risksharing Agency" that has about $100 million in reserve for claims.

195) White and Case, one of the 05-02122 defendants, is a wealthy global law firm.

196) The arrests were also requested by attorneys associated with "Mutual Insurance". Chris

Beall, who Judge Nottingham designated as "the lead" was billing "Mutual Insurance".

197) Jerome Schaefer, who threatened the plaintiffs with arrest and was a defense counsel in the

three D.C. cases, was the CEO of "Mutual Insurance".

198) The particular "Mutual Insurance" associated with Chris Beall and Jerome Schaefer is not

regulated by or recognized by any state insurance commissioner and claims that its only legal

domicile is in Bermuda.

199) Although "Mutual Insurance" does not have any published financial information, it claims

to offer insurance against both defamation and employment claims and presumably has enough

funds to pay such claims.

200) The American Bar Association, the third DC 05-02122 defendant, publishes that it has total

current assets of $355 million and current annual operating revenue of $228 million.

201) The DOJ acted to prevent a hearing on the merits in 05-02122 and thereby prevented the

plaintiff from collecting her 05-02122 claim from the defendants or their insurance.

202) The plain language of Federal Rules of Evidence 804 (6) reads

Rule 804 – Exceptions to the Rule Against Hearsay–When the Declarant Is Unavailable as a
Witness (6) Statement Offered Against a Party That Wrongfully Caused the Declarant's
Unavailability. A statement offered against a party that wrongfully caused — or acquiesced in
wrongfully causing — the declarant's unavailability as a witness, and did so intending that result.

203) 05-02122 stated 42 USC § 1985(2) as a cause of action.

204) 42 USC § 1985(2) is a cause of action for witness intimidation.

205) The principles of "forfeiture by wrongdoing" and the plain wording of Rule 804(6) require

the agency to accept her stated damage claim from 05-02122.

206) The plaintiff's first husband assigned his damage claims to the plaintiff.

207)  The damage claim in DDC 05-02122 was for $4 million plus $20,000 per day every day that she was imprisoned after receipt of service. She phrased it that way because she was in custody when she filed the lawsuit and she wanted to be released.

208)  The 05-02122 PACER report shows that it was served on or before 11/04/2005.

209) The plaintiff was imprisoned for 61 continuous additional days after service of the 05-02122 complaint in 2005 and 2006 plus February 8, 2006 plus 22 days in  2007.

210)  The demand  in the 05-02122 complaint calculates to $5,680,000 because the defendants in 05-02122 did not secure her release after service of the complaint.

211) Both the USMS and EOUSA have made recent representations that there were valid warrants for the plaintiff's arrest.

212) From 2009 to 2024 is 15 years.

213) When the plaintiff filed 09-0562 she was middle aged, now she is 70.

214) The DOJ staff acted wilfully and intentionally when they entered non-existent criminal charges into the PTS, WIN and NCIC,  when they created a detainer for a nonexistent felony, when they distributed records of her third party litigation to the USMS staff in Wisconsin, and when they used the PTS without a criminal proceeding.

215) 5 USC § 552a  requires compensation of the actual pecuniary damages sustained by the individual as a result of the refusal to follow the requirements of the statute.

216)  The actual damages sustained by the plaintiff include not only the $5,680,000 demand from the 05-02122 complaint, but also the loss of the value of that demand due to inflation between June 1, 2007 and August 1, 2024.

217) Inflation for June 1, 2007 through June 1, 2024 was 50.79%.

218) When adjusted for inflation, the plaintiff's damages due to the DOJ's witness intimidation regarding the 05-02122 lawsuit is $8,564,872.

## Public Policy

219) According to an article entitled *The Federal Rules of Pro Se Procedure* by Andrew Hammond published in Fordham Law Review Volume 90 Issue 6, 2022:

In recent years, more than a quarter of all federal civil cases were filed by people without legal representation. Yet, the Federal Rules of Civil Procedure refer to pro se litigants only once, and the U.S. Supreme Court has not considered in over a decade the question of what process is due to unrepresented civil litigants. Many judicial opinions in these cases go unpublished, and many are never appealed. Instead, the task of developing rules for pro se parties has taken place inside our federal district courts, whose piecemeal and largely unnoticed local rulemaking governs thousands of such litigants each year.

220)  The Rules Enabling Act requires that all court procedures be published. There are no published rules concerning so-called "filing restrictions" against pro se litigation.

221) In 2008,  a man named David Engle died in a fire in an unpermitted dwelling in Steamboat Springs. His home violated international building codes, because it did not have an emergency exit.  His neighbor tried to save him, but couldn't get in through the fire.  If the plaintiff had been able to establish facts about Steamboat government permit fraud in her 02-1950 lawsuit, Engle's fire death would have been less likely.

## Prayer

223) Since there is no jury trial option under 5 USC § 552a, the plaintiff prays that this Court will order the United States Department of Justice to pay her $8,564,872.

Respectfully,

*Kay Sieverding*

Kay Sieverding
31 Majestic Ave. Pelham NH 03076
6035087427 kay.sieverding@gmail.com.